UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                    Criminal Action No. 13-20254

vs.                                  HON. MARK A. GOLDSMITH

JOHN CHAMBERS,

     Defendant.

_____/

**OPINION AND ORDER
DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. 15)**

**I.  INTRODUCTION**

Defendant John Chambers is charged with one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  Indictment (Dkt. 3).  Defendant filed a motion to suppress evidence obtained as a result of an allegedly invalid investigative stop and subsequent search, including the firearm that forms the basis of the indictment (Dkt. 15).  The Government filed a response (Dkt. 17), and the Court conducted an evidentiary hearing on December 10, 2013.  Following the hearing, the parties filed supplemental briefs (Dkts. 21, 46, 47).  For the reasons that follow, the Court denies the motion to suppress.

**II.  BACKGROUND**

On January 9, 2013, the City of Flint emergency dispatch reported a shooting in the Regency apartments complex, at 2200 Devon Lane, Flint, Michigan.  Police Report at 1 (Dkt. 17-1).  The written police report of the incident states that Genesee County Sheriff Deputy Daniel Miller (the first officer to arrive at the scene of the reported shooting) advised by radio

1

dispatch that he observed two male subjects walking away from the area, one of whom was wearing a mask.  Id.

The police report also states that Michigan State Police Trooper Derek Hoffman and Michigan State Police Sergeant Brian Reece, who were "minutes away" in a patrol car, arrived at the Regency apartments complex and observed "two black males walking together eastbound on the south sidewalk in front of the apartment complex," one of whom was wearing a bandanna mask.  Id.  The two men were later identified as Sean Collins and Defendant John Chambers.  Id. Trooper Hoffman and Sergeant Reece stopped their patrol car and ordered the two subjects to stop; Sergeant Reece subsequently removed a loaded Taurus .40 caliber handgun from Defendant's pocket.  Id.  After locating the gun, Defendant was handcuffed, and Defendant's person was further searched.  Id. at 2.  The officers found two small bags of marijuana on Defendant's person.  Id. at 2.  Defendant was arrested on charges of possession of marijuana, carrying a concealed weapon, and felon in possession of a firearm.  Id.

Sergeant Reece, Trooper Hoffman, Deputy Miller, and Collins testified at the evidentiary hearing.  Sergeant Reece testified that he has been a Flint police officer for approximately six years, during which he commonly responded to shootings.  Hr'g Tr. at 7-8 (Dkt. 20).  On January 9, 2013, he was assigned to patrol Flint with Trooper Hoffman.  Id. at 8-9.  He testified that they arrived at the area of the reported shooting about three minutes after receiving the broadcast informing the officers of the shooting.  Id. at 10.  Sergeant Reece testified that, while the officers were driving to the area, they heard a dispatch "that there were two subjects walking on Lippincott in front of the Regency apartment complex and one of the subjects had a mask covering his face."  Id.  Sergeant Reece testified that this dispatch was broadcast by Deputy Miller.  Id. at 28.

Defendant's Exhibit B, admitted at the evidentiary hearing, is an overhead map of the Regency apartment complex. The map indicates that the complex contains multiple buildings and a network of several surface streets. Lippincott Boulevard, which runs east and west, borders the complex to the north. Def. Ex. B; see also Tr. at 17, 71. On the left or western side of the map, Lippincott intersects Tebo Street, which runs north and south, and on the right or eastern side of the map, Lippincott intersects South Averill Avenue, which runs north and south. Def. Ex. B, Tr. at 71. The entrance to the complex is to the south of Lippincott, between Tebo and Averill. Tr. at 18. The map indicates that Devon Lane is a surface street south of Lippincott, within the complex.

Sergeant Reece stated that, as he approached the apartment complex, he was driving eastbound on Lippincott. Tr. at 18. He saw "two subjects walking together in front of the complex," on the south sidewalk of Lippincott, and noticed that one of the subjects was wearing a bandanna mask covering part of his face. Id. at 10-11, 20. Sergeant Reece stated that the two individuals were "walking right next to each other going in the same direction," and that at the time he observed them, they were about twenty to thirty yards from the entrance to the apartment complex. Id. at 11. Aside from these two individuals, Sergeant Reece did not see any one else walking on the street. Id. at 14. The officers stopped their patrol car "right near the two people walking on the sidewalk," on Lippincott, closer to Averill than to Tebo. Id. at 19-20.

Sergeant Reece testified that, in his experience, a bandanna mask covering a person's face is "more associated with concealing their identity in relation to them committing a crime." Id. at 11. He stated that observing a person who appears to be with a masked individual close to the scene of a shooting would give rise to concern that the two people "were in concert with whatever they were doing or just doing." Id. at 31. Given that the subjects were walking near

3

the scene of a reported shooting and one was wearing a mask, Sergeant Reece believed  there

was "a high potential" for a "life-threatening or life-endangering situation."  Id. at 13.  He also

noted that it was dark out at this point.  Id. at 14.

Sergeant Reece testified that he and Trooper Hoffman stopped the patrol car, pointed

their service weapons at the two subjects, and told them to put their hands up.  Id. at 11.

Sergeant Reece contacted Defendant and asked him if he had a gun; Defendant said yes,

Sergeant Reece then asked him where it was.  Id. at 12.  Defendant said the gun was in his right

front coat pocket, from which Sergeant Reece then retrieved a firearm.  Id. at 12-13.  Sergeant

Reece later testified that the subject wearing the mask was Collins, and that Defendant had

nothing covering his face.  Id. at 26.

Trooper Hoffman testified next at the evidentiary hearing.  He stated that he has been

employed by the Michigan State Police for approximately sixteen years.  Id. at 34.  Trooper

Hoffman testified that, after receiving the broadcast regarding a shooting at the Regency

apartments, he and Sergeant Reece arrived at the area of the reported shooting in under a minute,

at approximately 6:50 p.m.  Id. at 35-36.  Trooper Hoffman testified that they also received a

radio dispatch stating that two subjects were walking eastbound, leaving the area of Devon Lane,

and that one of the subjects had a bandanna or mask covering his face.  Id. at 36-37.  He testified

that, when he saw the two individuals later identified as Collins and Defendant, the two

individuals appeared to be walking "pretty much right next to each other;" one of them had a

mask on.  Id. at 38.  He testified that the mask "[r]aised [a] suspicion about both the individuals

being together and leaving the scene . . . ."  Id. at 42.

Deputy Miller next testified and stated that he had no recollection of either making or not

making a radio communication on January 9, 2013.  Id. at 51.  He testified that it "wouldn't be

4

uncommon for [him] to give that information [] as a reflex . . . ."  Id. at 62.

Defendant then called Collins to testify.  Collins stated that he had not met Defendant before the incident.  Id. at 75.  Collins also testified that he was not wearing a bandanna, but was wearing a camouflage hunter's mask that covered the lower part of his face, with a hole for his mouth;  he also stated that the mask had eye holes.  Id. at 86-88.

Collins testified that, on the night in question, he was walking on the south sidewalk of Lippincott, in between Tebo and Averill, and heading eastbound toward Averill.  Tr. at 71-72. Collins testified that he saw a person, later identified as Defendant, who was "coming from inside the apartment" complex and, upon exiting the complex, began walking on the same sidewalk as Collins.  Id. at 75.  Defendant was walking behind Collins and in the same direction as Collins.  Id.  Collins testified that, when he first noticed Defendant, he and Defendant were "pretty far apart," id. at 78, but that the gap between them closed as they continued eastbound. Id.  Collins testified that Defendant was approximately forty to fifty feet away, id. at 76, although Collins did not specify at which point he estimated Defendant to be this distance away.  Collins later testified that when the police actually stopped the two men, Collins and Defendant were "some more than ten, fifteen feet . . . apart. . . . I guess you can say twenty, twenty-plus feet."  Id. at 79-80.  Collins later testified that they were never closer than approximately forty feet apart. Id. at 81.

Collins also testified that the police vehicle that stopped them was a truck, and that he never saw the passenger side of the vehicle open.  Id. at 91-92.  Collins thought it was one individual in a truck who stopped him, and that a second officer arrived in a second truck with a dog in the back.  Id. at 93-94, 102-103.  Collins testified that he heard the officers ask Defendant if he had a gun, and that Defendant said he had a gun in his pocket.  Id. at 103-104.   Collins

testified that he saw and recognized Defendant, getting off a bus, a week later.  Id. at 83.  He testified that on the evening of January 9, he was never closer to Defendant than the point at which they were both stopped; Defendant and Collins were kept in separate cars and were not taken to the police station together.  Id. at 99-100.

Sergeant Reece was recalled to testify; he stated that, on January 9, 2013, he and Trooper Hoffman were together in a patrol car, and that there was no dog in the vehicle.  Id. at 110.  He testified that Collins and Defendant were never fifty feet apart, and that he believed they were together at the time the officers stopped them.  Id.  Sergeant Reece testified that, if the two individuals had been a considerable distance apart, he and Trooper Hoffman would not have been able to engage both at the same time.  Id. at 112.

### III. ANALYSIS

In response to a motion to suppress, the Government has the burden of demonstrating, by a preponderance of the evidence, that the search or seizure was constitutionally valid.  See United States v. Bradley, 163 F. App'x 353, 357 (6th Cir. 2005) (citation omitted).  Because the Court concludes that the stop and subsequent search of Defendant were constitutionally valid, Defendant's motion will be denied.

Under Terry v. Ohio, 392 U.S. 1 at 27, 30 (1968), an officer may conduct an investigatory stop-and-frisk if the officer has reasonable suspicion of criminal activity.  The Sixth Circuit has explained:

> Police may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime. . . . "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person . . . of criminal activity."  It requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop.  The standard outlined in Terry and its progeny is not onerous. The requisite level of suspicion "is

6

> considerably less than proof of wrongdoing by a preponderance of the evidence." Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause.

Houston v. Clark Cnty. Sheriff Deputy John Does 1-5, 174 F.3d 809, 813 (6th Cir. 1999) (citations omitted). "Whether an officer has reasonable suspicion to support a Terry frisk is a fact-specific inquiry that looks at the totality of the circumstances in light of common sense and practicality." United States v. Robinson, 615 F.3d 804, 807-808 (7th Cir. 2010) (citations and quotation marks omitted). In assessing a Terry stop-and-frisk, the Court "first ask[s] whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." United States v. Carruthers, 458 F.3d 459, 464 (6th Cir. 2006) (citations and quotation marks omitted). "If the stop was proper, then [the Court] must determine whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Id. (citations and quotation marks omitted).

In light of this standard, the Court turns to the parties' arguments. Defendant argues that the investigative stop and search violated the Fourth Amendment. Def. Br. at 4 (Dkt. 15). Defendant asserts that there are a number of disputed facts in this case, which undermine the validity of the stop and search. Def. Supp. Br. at 1-2 (Dkt. 46). Defendant argues that Deputy Miller has no memory of making a radio dispatch describing the two subjects, and that there is some evidence Deputy Miller was not on the scene before Sergeant Reece and Trooper Hoffman arrived. Id. at 1. Defendant contends that Sergeant Reece and Trooper Hoffman provided different estimates of how long it took to arrive at the Regency apartment area, and that although the two officers stated Defendant and Collins were walking together, Collins testified he was

7

forty feet ahead of Defendant.  Id. at 2.  Defendant argues that, although the troopers testified Collins had a bandanna, Collins stated he had a hunter's mask with eye and mouth holes.  Id. Defendant maintains that, because Collins is the only witness "without an agenda," his testimony should be credited over that of the officers, and that, if the Court accepts Collins' testimony as true, the investigative stop is unsupported by reasonable suspicion.  Id. at 2, 4.

The Government argues that the motion to suppress should be denied because, based on the totality of the circumstances, reasonable suspicion existed to stop Defendant and pat him down.  Gov't Br. at 1 (Dkt. 17), Gov't 1st Supp. Br. at 6 (Dkt. 21).  The Government maintains that the Court should consider the "collective knowledge" known to Sergeant Reece, Trooper Hoffman, and Deputy Miller at the time of the stop.  Gov't 1st Supp. Br. at 6-7.  The Government argues that, although Defendant was not involved in the Regency apartment shooting, and that Defendant and Collins did not know each other, this mistake in fact does not negate the fact the officers' reasonable suspicion at the time of the stop.  Id. at 8.

The Government contends that the officers' reasonable suspicion was based on observing two individuals walking away from the area where a shooting occurred several minutes ago, and one of the individuals was wearing a mask.  Id. at 9.  The Government further argues that, even if Collins lacked an agenda, his testimony was internally inconsistent and, therefore, not credible. Gov't 2nd Supp. Br. at 2 (Dkt. 47).  The Government asserts that Defendant's only argument is that the Court should credit Collins' testimony over the officers', and that Defendant does not argue lack of reasonable suspicion in the event the Court finds the officers' testimony more credible.  Id. at 4.

### A.  Proper Basis for the Stop

The Court turns to the issue of whether "there was a proper basis for the stop, which is

judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." Carruthers, 458 F.3d at 464. In support of its argument that reasonable suspicion existed to effect the stop of Defendant, the Government principally relies on two cases, Houston, 174 F.3d 809, and United States v. McMullin, 739 F.3d 943 (6th Cir. 2014).

In Houston, 174 F.3d at 811-812, two officers witnessed fights breaking out outside of a bar, heard a thudding or popping noise that they believed was gunfire, and saw an individual lying on the ground bleeding from his head. The officers believed this individual had been shot. Id. One officer dispatched a message regarding a suspect who was leaving the area in a car; another officer, based on the dispatch, stopped a car a short distance away, drew his weapon, and ordered the passengers out of the car. Id. at 812. The officers later learned that (i) there had been no shooting outside the bar and (ii) the officer who stopped the car misinterpreted the dispatcher's method of identifying which car contained the suspect leaving the area. Id.

Despite the officers' mistakes of fact, the Sixth Circuit concluded that the officers possessed a reasonable suspicion that the occupants of the stopped car were involved in a shooting. Id. at 813-814. The court pointed to the "specific and articulable facts" of the noise resembling gunfire, the wounded individual, and the fact that the officer "noticed a passenger enter a car next to the victim, watched the same car speeding away from the bar's parking lot, and identified the vehicle as best he could under hurried and otherwise difficult circumstances." Id. at 813. In addition, the officer who effected the stop "reasonably believed his partner's radio message to the effect that suspects in the crime were driving away from [the bar]." Id. at 814. Because the officers' suspicion was reasonable, the validity of the stop was upheld.

In McMullin, 739 F.3d at 944-945, officers received a dispatch reporting a breaking and

entering a house.  The officers approached the subject location and saw the defendant standing close to that house near a broken window; the defendant then began walking away from the area. Id. at 944.  The officers stopped the defendant and, "[c]oncerned for their safety and believing that [the defendant] might be a suspect in the breaking and entering, the officers immediately frisked [the defendant] to ensure that he did not have any weapons."  Id.  The officers later learned that the defendant was not involved in the reported breaking and entering.  Id. at 945.

The court concluded that the defendant's proximity to the house that was reportedly broken into only a few minutes previously, and the fact that the defendant began walking away from the area, supported the officers' reasonable suspicion to stop the defendant.  Id. at 946-947. The court concluded that this reasonable suspicion existed despite the fact that the occupants of the house were yelling that the defendant was "not the guy," because the encounter with the defendant happened in a matter of seconds.  Id.

The Sixth Circuit, therefore, has indicated that a suspect's close proximity to the area of a reported crime and, in particular, the suspect's leaving the area of the reported crime, can be significant evidence supporting an officer's reasonable suspicion that the suspect was involved in a crime, especially when the officer must assess the available information and make a decision within a short period of time.  This is true even if the officer is mistaken about the nature of the crime or the suspect's involvement in the crime.

In this case, the Government cites the following factors as grounds to justify the stop of Defendant: (i) the reported shooting at the Regency apartment complex; (ii) the broadcast reporting two individuals walking away from the area of the shooting, one of whom was wearing a mask; (iii) the observation of two men walking away from the entrance to the apartment complex; (iv) the fact that no other people were walking in that area; (v) the fact that one of the

men appeared to be wearing a bandanna or other mask; (vi) the officer's awareness that wearing a bandanna or mask may be associated with the commission of a crime; and (vi) the fact that the two men appeared to be together.

Defendant argues that some of these factors are in dispute; namely, whether Defendant and Collins were walking close together and whether Deputy Miller made a dispatch to report the subjects walking away from the area. Defendant maintains that if the Court credits Collins' testimony, then there was no reasonable suspicion to effect the stop. The Court, however, concludes that Collins' testimony regarding the distance between Defendant and himself is internally inconsistent and, therefore, not credible. Collins testified, at one point, that Defendant was never closer than forty feet to him, Tr. at 81, but at another point he stated that at the time of the arrest, Defendant was "closer," about ten to fifteen feet away. Id. at 78-79. Collins also was able to recognize Defendant a week after they were both stopped, which undercuts Collins' assertion that he was never closer than forty feet to Defendant on January 9. These points render Collins' testimony about the distance between himself and Defendant inconsistent and suspect.

In addition, Collins testified that the vehicle used by the police who effected the stop of him was a truck with one officer in it, and that a second officer later arrived in a second truck with a dog in the back, id. at 91-92, 94, 102-103, whereas there is strong evidence that two officers were in one patrol vehicle at the stop. See Police Incident Report (Dkt. 17-1) (indicating that Sergeant Reece and Trooper Hoffman both responded to the dispatch and effected the stop of Defendant); Tr. at 9-13 (Sergeant Reece testified that he and Trooper Hoffman were in a patrol car when they heard the dispatch, and they arrived at the area of the reported shooting minutes later); Tr. at 37-39 (Trooper Hoffman testified that he and Sergeant Reece effected the stop of the individuals). Sergeant Reece also testified that the patrol vehicle was a sedan, with

11

no dog in it. Id. at 110. Overall, Collins' mistaken recollections regarding the the number of officers in the vehicle, as well as the internal inconsistency in his testimony, raise doubts as to the accuracy of his recollection of the event in general.[1]

The testimony of the two officers, however, was both internally consistent and, for the most part, consistent with each other. Both Sergeant Reece and Trooper Hoffman maintained that Defendant and Collins were close enough that the officers thought they were walking together. Defendant asserts that the inconsistency in how long the officers thought it took them to arrive at the area – Sergeant Reece estimated it took three minutes, whereas Trooper Hoffman thought it took less than one minute – undercuts the credibility of the officers' testimony; the Court, however, concludes that this single, minor discrepancy in estimating time during a rapidly evolving situation does not detract from the credibility of the otherwise consistent testimony of the officers. For this reason, the Court credits the officers' testimony that Defendant and Collins were close enough to each other to appear that they were walking together.

Defendant also seems to argue that there is an issue of fact as to whether Deputy Miller actually made the dispatch describing two men walking from the area of the shooting. Defendant notes that Deputy Miller has no recollection of making such a dispatch, and that, based on a Government Exhibit produced at the evidentiary hearing, Deputy Miller did not arrive on the scene until 6:55 p.m. or so – after Sergeant Reece and Trooper Hoffman would have arrived. Def Supp. Br. at 1 n.1. It is true that Deputy Miller has no recollection of making the broadcast, but he explained that it would not be uncommon for him to have made such a dispatch. Tr. at 51, 62. The Court also notes that Defendant appears to be misreading Government's Exhibit One;

---

[1] Although Defendant argues that Collins is the only witness without an agenda, the Court notes that regardless of whether Collins has an agenda, his testimony was internally inconsistent and, therefore, not credible. Nor will the Court discredit the officers' testimony solely on Defendant's unsupported assertion that the officers have an "agenda" in testifying.

the exhibit, which lists the event chronology of the incident, indicates that Deputy Miller was at the Devon Lane location at approximately 6:49 p.m., which is consistent with Sergeant Reece's testimony that he heard Deputy Miller's dispatch describing the two subjects as he and Trooper Hoffman were on route.

The Court concludes that based on the totality of the circumstances, the officers had specific, articulable facts leading to a reasonable suspicion of Defendant. Here, police observed a person in close proximity to the area of a reported crime, and walking away from that area. In addition, the officers perceived that Defendant was walking with a person who had a mask or covering on his face – a circumstance reported in the police dispatch and one that in the officers' experience may be associated with the commission of a crime.[2]

Furthermore, the officers who effected the stop were aware of a dispatch made by Deputy Miller noting that two subjects, one of whom was masked, were leaving the area of the shooting.[3] Reliance on the dispatch does not, in and of itself, render the subsequent stop valid unless the dispatching officer had reasonable suspicion. See United States v. Graham, 483 F.3d 431, 440 (6th Cir. 2007) (noting that any evidence seized from a search premised on a dispatch alert is admissible if the officer who issued the dispatch had reasonable suspicion to justify the search). However, in this case, the totality of the circumstances of which the officers were collectively aware, including the two subjects' proximity to the area of a shooting just minutes after the reported shooting, gave rise to reasonable suspicion justifying the search. See United

---

[2] Because it is undisputed that Collins was wearing a mask of some sort that at least partially covered the lower part of his face, the Court concludes that it is not material whether the mask was a bandanna or a different kind of face covering.

[3] Defendant does not challenge the admissibility of the testimony summarizing this dispatch. The Court also notes that "[a]t a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." United States v. Raddatz, 447 U.S. 667, 679 (1980) (citation omitted).

States v. Hinojos, 107 F.3d 765, 768 (10th Cir. 1997) ("[L]aw enforcement officers may pool their information and [] reasonable suspicion is to be determined on the basis of the collective knowledge of all the officers involved." (citation omitted)).

Finally, the officers' mistakes of fact do not render their reliance on the above-discussed factors unreasonable.  See, e.g., Brinegar v. United States, 338 U.S. 160, 176 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part."); Houston, 174 F.3d 809 (concluding the officer had reasonable suspicion to effect a stop despite the officer's mistaken belief that a shooting had occurred and misunderstanding of which car the alleged shooter had entered); McMullin, 739 F.3d 943 (concluding that the officers were not unreasonable in making an investigative stop of the defendant, although the defendant was not actually involved in the reported breaking and entering).

For these reasons, the Court concludes that the officers had reasonable suspicion justifying the stop of Defendant.

**B. Degree of Intrusion**

Because the stop was proper, the Court "must determine whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances."  Carruthers, 458 F.3d at 464.  Under Sixth Circuit precedent, the Court addresses this issue despite the fact that Defendant does not directly challenge the constitutionality of the degree of intrusion.  See McMullin, 739 F.3d at 945 ("[The defendant's] counsel's failure to clearly distinguish between the constitutionality of the stop and constitutionality of the frisk will not prohibit this Court from analyzing the 'frisk' issue presented.").

14

Upon observing Defendant, the officers drew their weapons and ordered Defendant to stop. Sergeant Reece asked Defendant if he had a gun and Defendant said yes. Sergeant Reece asked Defendant where it was, and Defendant said it was in his right front pocket. Sergeant Reece retrieved the gun from his pocket. Defendant was then handcuffed while the officers continued searching his person.

The Court concludes that the officers' conduct in drawing their weapons, and Sergeant Reece's frisk of Defendant, were constitutionally supported. "[W]hen police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are 'reasonably necessary for the protection of the officers.'" Houston, 174 F.3d at 814-815 (citations omitted). In this case, Sergeant Reece testified that "it was a high potential that, [sic] life-threatening or life-endangering situation meaning that there was a shooting just recently, we were in the area and we had two subjects in the area at that time that potentially could be armed." Tr. at 13. As discussed above, the officers had a reasonable suspicion that Defendant was involved in the reported shooting, and it was reasonable for the officers to fear that Defendant might have been armed. The officers acted reasonably in drawing their weapons. See Houston, 174 F.3d at 815 (concluding that the officers "drew and aimed their weapons based upon the reasonable belief that [the suspects] had been involved in a shooting").

Furthermore, the officers' reasonable suspicion that Defendant was involved in a shooting crime, coupled with Defendant's statement that he had a gun, was "sufficient for the officer to conduct a frisk of the subject." McMullin, 739 F.3d at 946. The officers were aware that Defendant was armed and had a reasonable suspicion that he may be dangerous. The frisk was constitutionally valid.

15

Finally, after the Sergeant Reece located the gun on Defendant's person, it was reasonable for the officer to place Defendant in handcuffs while he continued frisking Defendant; the officers were concerned about safety and the risk that Defendant may be dangerous.  See, e.g., Kowolonek v. Moore, 463 F. App'x 531, 536-537 (6th Cir. 2012) (noting that handcuffing a suspect is permissible under Terry where the subject is armed or otherwise may present a risk to office safety).

For these reasons, the Court concludes that the degree of the intrusion was reasonably related in scope to the situation at hand.

## IV.  CONCLUSION

For the reasons stated above, the motion to suppress (Dkt. 15) is denied.

SO ORDERED.

Dated:  April 7, 2014                                    s/Mark A. Goldsmith
          Flint, Michigan                                MARK A. GOLDSMITH
                                                         United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 7, 2014.

                                                         s/Deborah J. Goltz
                                                         DEBORAH J. GOLTZ
                                                         Case Manager