UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | 4:13-CR-20254-TGB |
| Plaintiff, | |
| | **ORDER DENYING PETITIONER'S MOTION TO VACATE HIS SENTENCE PURSUANT TO 28 U.S.C. § 2255 (ECF NO. 73)** |
| vs. | |
| **JOHN CHAMBERS**, | |
| Defendant. | |

This matter is before the Court on Defendant-Petitioner John Chambers' motion to modify or vacate his sentence, pursuant to 28 U.S.C. § 2255. ECF No. 73. The Court ordered the Government to file a response, which it did on July 10, 2017. ECF No. 81. Petitioner filed a motion to amend and supplement his § 2255 pleading on December 12, 2018, which this Court also considers. ECF No. 85.[1] For the reasons stated herein the Court will **DENY** Defendant-Petitioner's motion to vacate (ECF No. 73).

## I. Facts and Procedural History

On January 9, 2013, there were reports of a shooting at an apartment complex in Flint, Michigan. A deputy from the Genesee

---

[1] The Court will grant Defendant-Petitioner's motion to supplement (ECF No. 85) and accepts the additional grounds for relief in the supplement as part of the motion under § 2255.

County Sheriff's Office, Deputy Daniel Miller, went immediately to the scene, and two Michigan State Police officers, Sergeant Brian Reece and Trooper Derek Hoffman, also received the report and followed suit. While en route, Sergeant Reece and Trooper Hoffman stated they received additional information from Deputy Miller—who at that point had arrived at the scene—as relayed through dispatch, that Miller observed two male individuals walking away from the area of the shooting and that one was wearing a mask. There is a dispute over whether Deputy Miller in fact relayed the description through dispatch before Reece and Hoffman stopped Petitioner. As they approached the entrance to the apartment complex, Sergeant Reece and Trooper Hoffman observed two individuals walking away from the apartment complex, one of whom was wearing a bandana to cover his face. The officers drew their weapons and ordered the two individuals to stop. One of those individuals was Petitioner Chambers, the other was a man named Sean Collins. In the course of stopping Chambers and Collins, Sergeant Reese asked them whether they had any weapons. Chambers stated he had a gun in his pocket. Reece searched Chambers' right jacket pocket and discovered a loaded firearm, a pink .40 caliber handgun. After learning that Chambers did not have a concealed pistol license, the officers arrested Chambers for Carrying a Concealed Weapon and Felon in Possession of a Firearm.

2

## A.   Motion to Suppress and Evidentiary Hearing

After Chambers was indicted for being a felon in possession of a firearm, ECF No. 3, Chambers' trial counsel filed a motion to suppress, arguing that Sergeant Reece and Trooper Hoffman's investigative stop and subsequent search of Chambers violated the Fourth Amendment because they lacked reasonable suspicion to conduct the stop. ECF No. 15. In its response, the Government argued the officers had reasonable suspicion to stop and search Chambers because it appeared he was traveling with Collins (who was wearing some kind of face covering), because the officers heard Deputy Miller report that he saw two men— one of whom was wearing some kind of face covering—leaving the scene of the shooting, and because they were seen walking near the area of the reported shooting. ECF No. 17. The Court held a hearing on Chambers' motion to suppress and sought supplemental briefing following the hearing.

The Court ultimately concluded that based on the totality of the circumstances, Sergeant Reese and Trooper Hoffman had specific, articulable facts that amounted to reasonable suspicion, permitting a lawful stop of Chambers. ECF No. 48, PageID.204. The factors the Court considered included that Chambers was seen in close proximity to the area of a reported crime, and walking away from that area, and that Chambers was seen walking with a person who had a mask or covering on his face—a description reported in the police dispatch as matching

3

someone potentially associated with the reported crime. *Id.* at PageID.203. The Court also determined that these factors gave rise to a constitutionally supported frisk of Chambers. *Id.* at PageID.205. The case proceeded to trial.

**B.   Trial**

At trial, Sergeant Reece testified that it took him and Trooper Hoffman less than three minutes to arrive at the area of shooting after receiving the police dispatch alert. ECF No. 61, PageID.422. Once they arrived in the area, Reece testified that he received additional information from Deputy Miller, who first arrived on the scene. *Id.* at PageID.423. Deputy Miller had apparently relayed that he had seen two individuals walking away from the area of the scene and that one of the individuals was wearing a mask. *Id.* Reece testified that as he and Trooper Hoffman were driving toward the scene, he observed two individuals walking down the street outside of the apartment complex matching this description. This was Chambers and Collins. Reece testified that Chambers was not the individual wearing the mask. Reece and Hoffman stopped their vehicle in front of the two, exited with their weapons drawn and told Chambers and Collins to put their hands up. Sergeant Reece approached Chambers, and Trooper Hoffman approached Collins. *Id.* at PageID.425. Reece testified that he asked Chambers if he had a gun and that Chambers responded yes. *Id.* Reece then asked where the gun was located, and Chambers responded that it was in his coat

4

pocket. *Id.* Reece testified that he recovered a loaded .40 caliber semiautomatic handgun, pink in color, from Chambers' right coat jacket pocket. *Id.*

Chambers was then handcuffed and placed in Reece and Hoffman's patrol vehicle. *Id.* at PageID.426. Reece testified that while Chambers was in the back of the squad car, Chambers made an "unsolicited statement" and asked Reece "was that the area where there was a shooting?" *Id.* at PageID.427. After Reece said yes, Reece testified that Chambers "made the statement that he made a mistake, that he was carrying his girlfriend's gun." *Id.* Reece testified that he did not ask any questions to elicit those responses. *Id.*

While Chambers was being held in the back of the patrol car, a woman approached and asked to speak with Chambers, which Reece permitted. *Id.* Reece testified that he heard Chambers tell the woman that he was sorry for having her gun. *Id.* at PageID.428. He also stated that this woman, later learned to be Shanna Allen, Chambers' girlfriend, approached Sergeant Reece with paperwork indicating that she was the owner of the firearm found in Chambers' coat pocket. *Id.* at PageID.450. Trooper Hoffman corroborated Sergeant Reece's account. *Id.* at PageID.456-58, 465.

Reece also testified that dashboard camera video footage would have been created as soon as Hoffman activated the emergency lights on the squad car. *Id.* at PageID.428. However, when Reece attempted to

retrieve the footage shortly before the trial, he learned that the police department recycles the video tapes every six months and therefore any footage of the incident had been erased. *Id.* Reece testified that he did not know the government would need the videotape for trial and that any failure to obtain the footage before it was erased was simply an "oversight" on his part; he stated that he did not intentionally fail to collect the video before it would be erased. *Id.* at PageID.428-29.

Petitioner's girlfriend, who admitted to owning the firearm, Shanna Allen also testified. She testified that she kept her pink and black Taurus .40 caliber firearm in a lockbox in her apartment and that the day Chambers was found with the gun, he had spent time in her apartment. *Id.* at PageID.488-90. She also testified to being called out to the squad car that evening, after Petitioner had been arrested and placed in the back seat. Allen testified to having a conversation with the officers and showing them proof that the firearm was hers but could not recall whether she had a conversation with Chambers. *Id.* at PageID.491. She also testified that Petitioner had at one point told her that he had previously been convicted of a felony. *Id.* at PageID.493.

During Petitioner's presentation of the evidence, trial counsel called a 911 dispatcher, Carol Jenson, and reviewed with portions of the 911 dispatch records of the call that brought Reece and Hoffman to the apartment complex. ECF No. 62, PageID.541. Jenson testified that in her review of the dispatch records, there was no indication that Deputy

Miller—the first deputy who arrived on the scene—made a dispatch in which he described any suspects before Reece and Hoffman arrived on scene. *Id.* at PageID.549, 556 ("Q: it is clear to you that the two men were stopped before Deputy Dan Miller arrived on the scene, yes? A: Yes, according to the – the chronology, yes.").

Petitioner also called Deputy Miller. *Id.* at PageID.557. Deputy Miller testified that he could not remember specific details of the evening, but based on the dispatch notes he reviewed, between the time he was dispatched to the apartments at 6:49 p.m. and when he arrived at the scene at 6:54 p.m., he did not transmit any description of any suspects. *Id.* at PageID.561. Deputy Miller testified that the 911 transmissions in this case could not be found. *Id.* at PageID.566.

## C. Post-Conviction

Chambers was convicted of being a felon in possession of a firearm (18 U.S.C. §922(g)(1)) in June of 2014 following a jury trial. The Court sentenced Chambers to a 21-month prison sentence, which was in the middle of the recommended guidelines range of 18–24 months. ECF No. 70, PageID.687, 674. Chambers filed a timely notice of appeal on November 26, 2014, arguing primarily that the Court erred in failing to grant the motion to suppress. ECF No. 68. The Sixth Circuit held oral argument on August 6, 2015, and ultimately denied Defendant's appeal. ECF No. 71; *United States v. Chambers*, 638 Fed. App'x 437 (6th Cir.

2015) (unpublished). In the instant petition, Petitioner brings several claims of ineffective assistance of counsel.

## II. 28 U.S.C. § 2255 Jurisdiction and Statutory Requirements

Petitioner filed the instant petition on April 20, 2016, roughly three months before his custodial sentence ended on July 14, 2016, at which time he began a two-year period of supervised release. ECF No. 83. Chambers successfully complied with the rules and regulations of supervised release and was discharged from supervision early on January 19, 2018. *Id*. Section 2255 of Title 28 of the United States Code provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. §2255(a). As noted in this section, standing is specifically limited to those "in custody." Petitioner has satisfied the "in custody" requirement because "[w]here a prisoner's sentence is not fully expired at the time of filing, but expires during the litigation of the collateral attack, the proceeding does not become moot." *Hampton v. United States*, 191 F.3d 695, 697 (6th Cir. 1999); *see also Carafas v. LaVallee*, 391 U.S. 234 (1968).

In considering a motion to modify or vacate his sentence, pursuant to 28 U.S.C. § 2255, the Court must consider "whether the claimed error of law was 'a fundamental defect which inherently results in a complete miscarriage of justice,' and whether '[i]t . . . . present[s] exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.'" *Davis v. United States*, 417 U.S. 333, 346 (1974). While generally, "claims not raised on direct appeal may not be raised on collateral review," a petitioner may raise ineffective assistance of counsel for the first time in a § 2255 motion. *Massaro v. United States*, 123 S. Ct. 1690, 1693 (2003).

## III. Discussion

### A.   Ineffective assistance of counsel relating to Petitioner's motion to suppress

Like all of Petitioner's ineffective assistance of counsel claims, Chambers' assertion that trial counsel was ineffective in litigating his motion to suppress must meet the "rigorous standard" of *Strickland v. Washington*. 466 U.S. 668, 687 (1984). The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious

9

that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Prejudice arises when counsel's errors were so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

To satisfy the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance." *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. There is a strong presumption that trial counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy.

As to the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. "A court need not determine whether counsel's performance was deficient, if it is easier to dispose of an

10

ineffectiveness claim on the ground of lack of sufficient prejudice." *Crawley v. Curtis*, 151 F. Supp. 2d 878, 883 (E.D. Mich. 2001) (citing *Strickland*, 466 U.S. at 697).

### i. Petitioner's self-incriminating statements

Petitioner alleges that his statements to the police were obtained in violation of *Miranda v. Arizona*, 384 U.S. 463 (1966), and that his attorney's failure to move to suppress the statements constituted ineffective assistance of counsel.

### a. The right to remain silent

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend V. To protect this right, an individual who

> is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning . . . must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 478-79. "A defendant is 'in custody' for purposes of *Miranda* when given the circumstances surrounding the defendant's encounter with police, a reasonable person in his shoes would have felt that he was not at liberty to terminate the encounter." *United States v. Brown*, 2016 WL 3055509, at *3 (E.D. Mich. May 31, 2016) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004)). "'Interrogation' occurs

whenever police say any words or take any actions that they should know are reasonably likely to elicit an incriminating response." *Id.* (citing *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980)).

Here, the question is whether defense counsel was ineffective for failing to move to suppress Petitioner's statements to police on the grounds that the statements were taken in violation of *Miranda* and Petitioner's right to remain silent. But it is not the case that defense counsel failed to file a motion to suppress. Defense counsel aggressively litigated the constitutionality of Petitioner's stop, presumably with the hope that all interactions with the officers occurring after the stop would be suppressed, including Petitioner's subsequent incriminating statements and the firearm found in Petitioner's coat pocket. However, the Court found that the stop of Petitioner was constitutionally permissible because it was supported by reasonable suspicion. The question, therefore, is whether it was ineffective for defense counsel to fail to move to suppress the statements in the event it was found that the stop of Petitioner was constitutional.

"[F]ailure to file a suppression motion does not constitute *per se* ineffective assistance of counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). The proper standard for defense counsel's performance is "reasonably effective assistance." *Strickland*, 466 U.S. at 687. Petitioner must show that his attorney's "representation fell below an objective standard of reasonableness." *Id.* at 688.

12

## b. Petitioner's statements

At trial, Detective Sergeant Brian Reece testified that when he and Trooper Hoffman exited their patrol car with guns drawn and began to approach Chambers and Collins, Reece specifically asked Chambers if he was armed. ECF No. 61, PageID.425.[2] He testified that Chambers responded he had a gun on his person, and when Reece asked him where the gun was, Chambers responded it was in his coat pocket. *Id.*

Reece also testified that once Chambers was handcuffed and placed in the patrol vehicle, Chambers "made an unsolicited statement" by asking Reece a question about the shooting. Further, Reece testified that Chambers made the statement that he made a mistake, that he was carrying his girlfriend's gun. Reece testified that he did not ask any questions to elicit those responses. ECF No. 61, PageID.427-28. Similarly, when Chambers' girlfriend, Shanna Allen, approached the police vehicle, the officers permitted her to speak with Chambers and they overheard the voluntary statements between them. *Id.* at PageID.428. These statements included Chambers apologizing to her for having her gun, though at trial Allen stated that she did not recall having a conversation with Chambers while he was in the squad car, failing to corroborate Reece's account. *Id.* at PageID.491.

---

[2] This is contrary to the Government's brief, which states that "[b]oth officers testified that Chambers made unsolicited statements, made statements without any questions asked of him and ma[de] a statement to his girlfriend in their presence." ECF No. 81, PageID.843.

Here, Chambers has not shown that the failure to file a motion to suppress by trial counsel would have resulted in the suppression of any statements and that the result of the proceeding would have been any different. First, many of Petitioner's later statements made to Sergeant Reece and to Allen were voluntary, spontaneous declarations that were not the product of any direct questioning by the officers. "Voluntary, spontaneous declarations are not the product of interrogation." *Brown*, 2016 WL 3055509, at *3 (citing *United States v. Murphy*, 107 F.3d 1199 (6th Cir. 1997)). Therefore, these statements would not have been suppressed.

Second, it is likely that Petitioner's statement that a firearm was located in his jacket pocket would not have been suppressed under the "public safety" exception to *Miranda*. *United States v. Reese*, 509 Fed.Appx. 494, 501-02 (6th Cir. 2012) (public safety exception applied where officers executing arrest warrant of defendant with history of narcotics violations and violence asked un*Mirandized* questions about whether there were any firearms in the home). "[W]hen officers ask 'questions necessary to secure their own safety or the safety of the public' as opposed to 'questions designed solely to elicit testimonial evidence from a suspect,' they do not need to provide the warnings required by *Miranda*." *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007) (quoting *New York v. Quarles*, 467 U.S. 649, 659 (1984)). "The public safety exception applies 'when officers have a reasonable belief based on

14

articulable facts that they are in danger.'" *Reese*, 509 Fed.Appx. at 501 (quoting *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001)).

The Sixth Circuit uses a two-pronged test to evaluate the reasonableness of an officer's belief that he or the public is in danger:

> [A]t a minimum, [the officer] must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to the weapon and inflict harm with it. The public safety exception is applied if and only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety.

*Id.* at 502 (quoting *Talley*, 275 F.3d at 563) (alterations in original). Here, evidence submitted at the suppression hearing and trial demonstrated that the officers had reason to believe that Chambers or the person he was traveling with might be armed and that either might use the weapon having left the scene of a reported shooting.

The outcome of the case, however, likely would not have been different had these exceptions been inapplicable and defense counsel successfully suppressed Petitioner's statements in violation of *Miranda*. Even if Chambers' statement that he had a gun in his pocket was suppressed because the officers failed to give him *Miranda* warnings, the physical fruits of his unwarned statement (i.e., the firearm in his pocket) would not have been suppressed. Absent evidence that the statements were involuntary or coerced, the fruits of an un-*Mirandized* statement are not suppressed. *See United States v. Patane*, 542 U.S. 630, 637-38

15

(2004) (holding that officer's failure to give suspect *Miranda* warnings did not require suppression of the physical fruits of the suspect's unwarned but voluntary statements); *United States v. Reese*, 509 Fed.Appx. 494, 503 (6th Cir. 2012) (quoting *Patane* for the proposition that "the *Miranda* rule protects against violations of the Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements" and that therefore there is "no reason to apply the 'fruit of the poisonous tree' doctrine"). And here, Petitioner does not argue, nor does the record bear out, any indication that Chambers made involuntary or coerced statements under the Fifth Amendment. *See Colorado v. Connelly*, 479 U.S.157, 170 (1986).

Therefore, even if it could be alleged that Chambers had a successful *Miranda* argument regarding some or all of these statements, Chambers cannot show that but for the admission of his self-incriminating statements, the outcome would likely have been different. *See Strickland*, 466 U.S. at 687. Indeed, regardless of these statements, the jury had ample evidence to find that Chambers possessed the firearm that was found on his person, including the testimony of Sergeant Reece, Trooper Hoffman, and the owner of the gun, Chambers' girlfriend Shanna Allen. Because Chambers cannot show that any failure to contest the admissibility of some or all of his incriminating statements would have

affected the outcome of the trial, Chambers cannot show prejudice, which he must do to establish ineffective assistance of counsel.

### ii. Portions of 911 and police dispatch databases

Second, Chambers argues that his counsel was ineffective in failing to argue the suppression of portions of 911 and police dispatch databases. To suppress evidence under the Fourth Amendment, a defendant must show that he has standing, meaning that he has a property or possessory interest in the evidence he seeks to suppress. *Rakas v. Illinois*, 439 U.S. 128, 148 (1978). This is because the Fourth Amendment only protects a person from the search or seizure of something as to which that individual has a reasonable expectation of privacy. *Id.* Chambers has no such reasonable expectation of privacy in 911 and police dispatch reports, records, or databases because he can claim no property or possessory interest in those records. Given that a motion to suppress the 911 and police dispatch databases would not have been granted, it was not ineffective for Chambers' counsel to decline to file such a motion.[3] *United States v. Martin*, 45 F.App'x 378, 381 (6th Cir. 2002).

### iii. Destruction of police dash camera video footage

Petitioner also claims that defense counsel's failure to make various arguments about the destruction of police dash camera video footage

---

[3] Further, trial counsel effectively used the 911 dispatch records to argue that the testifying officers lacked credibility, which was a reasonable tactic seeking to suggest there was reasonable doubt. ECF No. 62, PageID.606 (closing argument).

constituted ineffective assistance of counsel. ECF No. 73, PageID.729 (suppression argument); *id.* at PageID.734 (*Brady* argument).

According to the record, the issue of whether video footage existed showing the stop, search and seizure of the firearm was not raised during the hearing on Defendant's motion to suppress. When Sergeant Reece and Trooper Hoffman were on the stand, Defense counsel did not inquire about whether such video existed.[4] And defense counsel's supplemental memo on the motion to suppress filed after the hearing seems to imply that no video exists, expressly stating that there was no corroboration of Reece and Hoffman's testimony. ECF No. 46, PageID.182.[5] It was not until Sergeant Reece testified for the Government at trial that the previous existence, and the later destruction, of the dash camera footage were discovered.

At trial, Sergeant Reece testified that there was a camera in the patrol vehicle that turns on when emergency lights are engaged. ECF No. 61, PageID.428. Because emergency lights were activated here, Reece testified "there would have been a video of the stop." *Id.* When asked if he "recently" attempted to retrieve the video, Reece testified that he

---

[4] The docket is also devoid of any evidence showing that Defense counsel sought the preservation or production of any police dash camera video footage prior to trial.

[5] Up through the hearing on Defendant's motion to suppress, Chambers was represented by an attorney with the Federal Defender's Office. Following the hearing and before the supplemental memo was filed, that attorney withdrew as counsel due to a breakdown in the attorney-client relationship. Chambers' trial counsel was appointed and was responsible for Chambers' supplemental memo and all subsequent filings and proceedings.

"discovered" that the police department cycles through videotapes every six months and did not know that he would need the videotape for trial.[6] *Id.* Because the videotape had already been cycled out, the video had been erased. *Id.* When questioned, Reece testified the video had been erased as an "oversight" and did not do so "intentionally." *Id.* at PageID.428-29.

"Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U.S. 479, 488-89 (1984) (citing *United States v. Agurs*, 427 U.S. 97 109-10 (1976)). In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court "narrowed the Government's constitutional obligations regarding the preservation of evidence." *United States v. Vega*, 826 F.3d 514, 533 (D.C. Cir. 2016). *Youngblood* held that in cases where the exculpatory value of the evidence is unknown, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of

---

[6] The incident occurred on January 9, 2013, Chambers was indicted on April 3, 2013, the hearing on Chambers' motion to suppress occurred on December 10, 2013, and trial began on June 30, 2014.

19

law." 488 U.S. at 58. *Youngblood* clarified that "the Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." *Id.* at 57. But if "no more can be said" about the evidence "than that it could have been subjected to tests, the results of which might have exonerated the defendant," there is no due process violation unless the defendant can demonstrate the Government acted with bad faith. *Id.* at 57-58. Thus, *Youngblood* clarifies *Trobetta* and holds that a Due Process violation for missing evidence only occurs where the missing evidence is exculpatory and material or where "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.* at 58.

In *Youngblood* the exculpatory value of untested physical evidence was unknown to the officers—the officers would not know whether, when tested, the physical evidence would prove to be inculpatory or exculpatory for the defendant. But here, Sergeant Reece necessarily knew the contents of the dash camera video and therefore knew whether the video was or was not actually (and not just potentially) exculpatory. He had direct knowledge of the video's materiality.

"The conspicuous absence of evidence with clearly 'knowable' exculpatory value," could point to Reece's bad faith if in fact the video was exculpatory rather than inculpatory. *Vega*, 826 F.3d at 534. And the Government's failure to retain video—video "for which the inculpatory or

exculpatory value seems obvious—is troubling." *United States v. Vega*, 826 F.3d 514, 534 (D.C. Cir. 2016). And it certainly raises an inference of negligence, possibly even gross negligence, on part of Sergeant Reece. But gross negligence is insufficient under *Youngblood*. *United States v. Turner*, 287 Fed.Appx. 426, 432 (6th Cir. 2008) (citing *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001)) ("A showing that the government was negligent, even grossly negligent, is insufficient to establish bad faith."). Therefore, any *Youngblood* challenge likely would not have been successful.

And consequently, the fact that defense counsel failed to move to dismiss, to move for an adverse jury instruction, or move for other sanctions based on spoliation of video evidence once its destruction was revealed mid-trial was not ineffective. Indeed, as mentioned, the record shows that defense counsel successfully used the disappearance of the police dash camera footage to undermine the credibility of the testifying officers, in an attempt to raise a reasonable doubt. ECF No. 61, PageID.477-78 (cross examination of ATF agent Harry Powers); ECF No. 62, PageID.606 (closing argument). And certainly, an attorney could choose not to request video footage of an incident and not call attention to its absence when the government fails to preserve it. As *Strickland* commands, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Because "[t]here are countless

ways to provide effective assistance in any case," *id.*, *Strickland* places the burden on Petitioner to prove otherwise. And here, where the video is certainly material and relevant because it would show the incident at issue, it is not certainly exculpatory, but instead "potentially useful evidence." *Youngblood*, 488 U.S. at 58. Chambers has not shown that trial counsel's performance was "outside the wide range of professionally competent assistance" because a *Youngblood* challenge likely would not have been successful. *Strickland*, 466 U.S. at 690. This claim fails.

## B. Ineffective assistance of counsel for failing to file a requested speedy trial motion

Chambers also alleges that his statutory and constitutional speedy trial rights were violated and that trial counsel was ineffective for failing to file a requested speedy trial motion.[7]

### i. Speedy Trial Act

The Speedy Trial Act "requires dismissal of a criminal case, with or without prejudice, if the defendant is not tried seventy days after his indictment or the date he first appears in court, whichever date last

---

[7] This claim appears to be copied and pasted from another petitioner's motion. It contends that the Government's delay before Petitioner's "second trial" impaired his defense by "causing oppressive pretrial incarceration, anxiety and concern, and overwhelming prejudice to Petitioner." ECF No. 73, PageID.732. Chambers did not have two trials and he was actually on pretrial release until he was sentenced. He appeared in federal court on July 24, 2013 and was temporarily detained until July 26, 2013, when he was released on bond. ECF No. 7, Order of Temporary Detention; ECF No. 9, Order Setting Conditions of Bond. Although this claim contends that Petitioner suffered "oppressive pretrial incarceration," he was only held for two days in pretrial detention.

occurs." *United States v. Robertson*, 260 F.3d 500, 502-03 (6th Cir. 2001) (quoting *United States v. Jenkins*, 92 F.3d 430, 438 (6th Cir. 1996)). Here, the government's speedy trial clock started to run on July 24, 2013, the date Petitioner was arrested and first appeared in court. EF Nos. 5-6. Various events, however, can stop the running of the Speedy Trial Act's seventy-day time period, including "delay for consideration of motions, pretrial proceedings, competency examinations, and other procedural matters." *United States v. Marks*, 209 F.3d 577, 586 (6th Cir. 2000) (citing 18 U.S.C. § 3161(h)). With these rules in mind, and with July 24, 2013, as our starting date, to determine whether the Speedy Trial Act was satisfied, the Court considers the following procedural timeline:

July 24, 2013: Petitioner's initial appearance

July 26, 2013: Petitioner's arraignment

August 26, 2013: Stipulation and order to adjourn dates and to exclude time under Speedy Trial Act from September 16, 2013 to December 5, 2013.

October 14, 2013: Petitioner files motion to suppress

December 10, 2013: Hearing on Petitioner's motion to suppress

January 27, 2014: Petitioner files motion for withdrawal of attorney

February 4, 2014: District court grants Petitioner's motion for withdrawal of attorney

23

April 7, 2014: District court denies Petitioner's motion to suppress after hearing and supplemental briefing

April 8, 2014: Stipulation and order to adjourn dates and to exclude time under Speedy Trial Act from April 7, 2014 to June 30, 2014

June 23, 2014: Pretrial conference

June 30, 2014: First day of Petitioner's trial

The speedy trial period began running on July 24, 2013. From July 24, 2013 to July 26, 2013, Petitioner was in initial appearances and arraignment, which are excluded from the 70-day clock. From July 26, 2013 to September 16, 2013, when the parties agreed to a stipulated order to exclude time under the Speedy Trial Act, 51 of the Government's 70 days elapsed. Pursuant to the stipulation and order entered on August 26, 2013, all time between September 16, 2013 and December 5, 2013 was excluded from the 70-day time period. Further, when Defendant filed his motion to suppress on October 10, 2013, the speedy trial clock paused until its resolution on April 7, 2014. On April 8, 2014, the parties again stipulated to excludable time under the Speedy Trial Act until June 30, 2014, the day trial began. No additional, non-excludable time elapsed before trial began. Therefore, only 51 days of non-excludable time ran on Petitioner's speedy trial clock for purposes of the Speedy Trial Act, well below the 70-day time period. Consequently, no Speedy Trial Act violation occurred. Because defense counsel has no duty to bring a legally

baseless claim, *Martin*, 45 F.App'x at 381, counsel here was not ineffective in failing to file a statutory speedy trial motion.

### ii. Constitutional

"The Supreme Court has specified four factors for evaluating a Sixth Amendment speedy-trial claim: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertions of his right, and (4) prejudice to the defendant." *United States v. Young*, 657 F.3d 408, 414 (6th Cir. 2011) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). "None of the factors is 'a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial,' but the factors are related and 'must be considered with such other circumstances as may be relevant' in 'a difficult and sensitive balancing process.'" *Id.* at 414 (quoting *Barker*, 407 U.S. at 533). The first *Barker* factor—length of delay—"serves as a threshold or a 'triggering mechanism' for a speedy-trial analysis" and is measured from "the earlier of the date of arrest or the date of indictment." *Id.* The Court need not consider the other *Barker* factors unless there has been an "uncommonly long" delay. *Id.* The Sixth Circuit has held that "a delay of more than one year is presumptively prejudicial and triggers application of the remaining three factors." *Id.*

Here, the length is measured from the date of Petitioner's indictment on April 3, 2013, which predated Petitioner's arrest on July 24, 2013. ECF Nos. 3-5. Chambers was convicted on July 1, 2014. ECF No. 54. "[I]n calculating the length of delay, only those periods of delay

25

attributable to the government or the court are relevant to [the defendant's] constitutional claim." *United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000) (citing *Barker*, 407 U.S. at 529) ("We hardly need add that if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine."); *see also United States v. White*, 985 F.2d 271, 275 (6th Cir. 1993) (excluding from the time counted towards a Sixth Amendment violation the time during which the defendant "expressly participated in the delay."). In this case, Petitioner stipulated to two delays in the proceedings; one from September 16, 2013 to December 5, 2013 (ECF No. 14), the second from April 7, 2014 to June 30, 2014 (ECF No. 49). Petitioner also sought withdrawal of trial counsel during the litigation of his motion to suppress, further contributing to any delay. Given these excusable periods, any delay in Petitioner's speedy trial rights not attributable to him was under one year and therefore was not presumptively prejudicial under the Sixth Amendment. *See Young*, 657 F.3d at 414; *United States v. White*, 985 F.2d 271, 275 (6th Cir. 1993) (six-and-one-half-month delay was not excessive); *United States v. Holyfield*, 802 F.2d 846 (6th Cir. 1986) (five month delay was constitutionally permissible). Therefore, Petitioner cannot overcome the threshold *Barker* factor.

Petitioner also asserts that a preaccusation delay occurred and amounted to a due process violation. ECF No. 73, PageID.730. This requires a showing that the Government not only delayed indictment but

did so intentionally to gain tactical advantage or harass the defendant and that delay resulted in actual and substantial prejudice. *United States v. Gouvela*, 467 U.S. 180, 192 (1984) (nineteen months between commission of crime and return of indictment). But Chambers has not argued how he was prejudiced by any delay in the four months between the January 2013 incident and April 2013 indictment.

In sum, because Chambers did not experience a delay of more than one year and can articulate no prejudice, no constitutional speedy trial violation occurred. As defense counsel has no duty to bring a legally baseless claim, *Martin*, 45 F.App'x at 381, counsel here was not ineffective in failing to file a speedy trial motion.

### C.    Ineffective assistance of counsel for failing to raise a *Brady* violation allegation against the prosecution

Related to his motion to suppress argument, Chambers alleges his counsel was ineffective in failing to raise a *Brady* violation allegation against the Government for failing to preserve the dash camera footage in the squad car. However, as explained above, there is no evidence in the record that the erasure of the dash camera footage was the result of bad faith or that the footage contained exculpatory evidence. Indeed, Petitioner does not argue that the dash camera footage would show that Petitioner did not possess the firearm found in his coat pocket. Accordingly, because Chambers' *Brady* violation claim related to the

destruction of the dash camera footage is would not have succeeded, it was not ineffective for defense counsel to fail to bring a *Brady* claim. *Martin*, 45 F.App'x at 381.

## D. Ineffective assistance of counsel for failing to argue prosecutorial misconduct

Chambers additionally makes allegations of prosecutorial misconduct related to the constitutionality of the stop and search of Petitioner. "To assess prosecutorial misconduct, we first determine whether the prosecutor's conduct was improper, and if so, whether the improprieties were flagrant." *United States v. McAllister*, 693 F.3d 572, 585 (6th Cir. 2012). "To determine flagrancy, we consider: (1) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of the evidence against the accused." *United States v. Tarwater*, 308 F.3d 494, 501 (6th Cir. 2002).

Here, Petitioner contends that the prosecutor knowingly permitted Sergeant Reece and Trooper Hoffman to lie on the stand because the investigatory stop of Chambers was not supported by reasonable suspicion. ECF No. 73, PageID.738-42. In doing so, Chambers attempts to relitigate the constitutionality of his stop and seizure. This issue was decided in the Court's order denying his motion to suppress and affirmed by the Sixth Circuit. *See* ECF Nos. 48, 71. Chambers cannot relitigate it

here because an argument previously addressed and rejected on direct appeal may not be relitigated through a § 2255 motion, absent exceptional circumstances such as an intervening change in the law. *Dupont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996). This includes issues raised in a motion to suppress. *Kelly v. United States,* 977 F.2d 581 (6th Cir.1992) (unpublished) ("The remainder of Kelly's arguments on appeal attempt to relitigate the issues involved in his motion to suppress evidence. The issues were raised and answered on direct appeal. Kelly is not now entitled to relitigate those issues in a motion to vacate sentence under 28 U.S.C. § 2255. A federal prisoner may not relitigate in a § 2255 motion to vacate sentence claims that were raised and considered on direct appeal."). The Court will not disturb its—and the Sixth Circuit's— holdings on the constitutionality of Petitioner's stop and seizure. This claim fails.

## E.    Grand jury decision to indict

Chambers further argues his counsel was ineffective in failing to challenge the indictment because the prosecutor impermissibly used Petitioner's self-incriminating statements to indict. ECF No. 73, PageID.743-44. First, Petitioner's self-incriminating statements were properly presented to the Grand Jury, regardless of their admissibility at trial. *In re Grand Jury Investigation*, 696 F.2d 449, 450 (6th Cir. 1982) (citing *United States v. Calandra*, 414 U.S. 338 (1974)); *see also Bracy v. United States*, 435 U.S. 1301, 1302 (1978). Additionally, as "[d]ismissal

of a grand jury indictment is appropriate only where a defendant can establish a long-standing pattern of prosecutorial misconduct before a grand jury and actual prejudice," Chambers' claim fails. *United States v. Griffith*, 756 F.2d 1244, 1249 (6th Cir. 1985). The record is devoid of any evidence of a long-standing pattern of misconduct and defense counsel could not have shown this. Given that this claim was meritless, it was not ineffective for defense counsel to fail to bring it. *See Martin*, 45 F.App'x at 381.

## F.   Ineffective assistance of counsel for failing to file a motion to dismiss

Chambers argues counsel was ineffective in failing to file a motion to dismiss on the basis that Petitioner's prior conviction from 1990 had been completed and therefore could no longer serve as a predicate offense under 18 U.S.C. § 992(g). ECF No. 73, PageID.745-46.

"The federal felon-in-possession statute involves a two-part inquiry: (1) if a convicted felon's civil rights have been restored under state law, he shall no longer be considered a felon for purposes of § 922(g) except (2) if, pursuant to the 'unless clause' of § 921(a)(20), the felon remains prohibited from firearms possession." *United States v. Campbell*. 256 F.3d 381, 391-92 (6th Cir. 2001), *abrogated on other grounds by Begay v. United States*, 553 U.S. 137 (2008). The Sixth Circuit has determined that, under Michigan law, "essentially all of a former felon's civil rights, including the right to vote, hold public office, and sit on a jury, are

restored under Michigan law upon the former felon's release from custody." *Id.* at 391 (citing *Hampton v. United States*, 191 F.3d 695, 702 (6th Cir. 1999)).

In 1992, the Michigan Legislature amended M.C.L. § 28.422 and enacted § 750.244f, which states that "for all but certain specified felonies, the waiting period is three years after the payment of all fines and the expiration of all periods of incarceration, probation and parole." *United States v. Cooper*, No. 08-20464, 2012 WL 12706, at *4 (E.D. Mich. Jan. 4, 2012) (citing § 750.224f(1)). "However, with regard to the so-called 'specified felonies,' the Michigan Legislature increased the waiting period to five years and included a requirement that the 'person's right to possess, use, transport, sell, purchase, carry, shop, receive, or distribute a firearm has been restored pursuant to [M.C.L. § 28.424].'" *Id.* (quoting § 750.224f(2)). "Section 28.424, in turn, describes the process whereby an individual who had been prohibited from possessing a firearm may submit an application to the concealed weapons licensing board for the restoration of this right." *Id.*

Chambers was convicted of possession of a controlled substance (less than 50 grams) in 1990. ECF No. 3 (Indictment). This is a "specified felony" within the meaning of § 750.224f. *See* Mich. Comp. Laws § 750.224f(6)(ii) (specified felonies include those for which an "element of that felony is the unlawful manufacture, possession, importation, exportation, distribution, or dispensing of a controlled substance").

31

Chambers does not argue that he ever applied to, or was approved by, the concealed weapons licensing board after his release from prison. Therefore, under § 750.224f(2), the restoration of his civil rights upon release from prison expressly excludes the right to possess firearms pursuant to the 'unless clause' of 18 U.S.C. § 920(a)(2), and his prior offense constitutes an applicable predicate offense under 18 U.S.C. § 992(g).

Nor is this a violation of the ex post facto clause. *See Cooper*, 2012 WL 12706, at *5 (citing *United States v. Haire*, 89 Fed.Appx. 551 (6th Cir. 2004) (unpublished) (conviction under § 992(g) did not violate ex post facto clause when change in state law, which occurred subsequent to defendant's prior conviction and release from prison, permanently prohibited him from possessing firearms because state statute and § 992(g) were enacted prior to relevant offense conduct; namely, possessing a firearm)). Here, as in *Cooper* and *Haire*, Chambers' offense conduct in 2013 occurred well after the enactment of § 922(g) and § 750.224f. Therefore, the application of these two statutes to his 2013 conduct does not present any ex post facto issues. *United States v. Clark*, No. 05-80810, 2006 WL 2033981, at *3 *E.D. Mich. July 18, 2006) ("[T]he 1992 modifications of the Michigan law on felon in possession of a firearm do not create an *Ex Post Facto* violation as to [the defendant] because the state's predominant interest in [Mich. Comp. Laws] § 750.224f was not to punish but to protect the public.").

In sum, because Petitioner's claim that he could not be convicted of felon in possession of a firearm lacks merit, it was not ineffective for defense counsel to fail to bring it. *See Martin*, 45 F.App'x at 381.

## G. Ineffective assistance of appellate counsel for failing to raise these issues on direct appeal

Petitioner additionally argues that his appellate counsel was ineffective in failing to raise these ineffective assistance of counsel claims on direct appeal. ECF No. 73, PageID.747-48. But the Sixth Circuit has held that "a defendant may not raise a claim for ineffective assistance of counsel on direct appeal." Rather, a defendant should raise such claims in a post-conviction proceeding under 28 U.S.C. § 2255, as Petitioner has done here. *Id.* Consequently, it was not ineffective for Petitioner's appellate counsel to fail to raise ineffectiveness claims on direct appeal. Further, as already explained, Petitioner's claims are meritless; because defense counsel has no duty to bring a legally baseless claim, *Martin*, 45 F.App'x at 381, appellate counsel here was not ineffective in failing to argue ineffective trial counsel.

## H. General ineffective assistance of counsel

The final section of Petitioner's § 2255 motion makes a general ineffective assistance of counsel argument, asserting that the cumulative effect of trial counsel errors amount to a Due Process violation. ECF No. 73, PageID.749-51. However, as the Court has already concluded,

Petitioner's trial counsel was not ineffective in raising any of the alleged errors described above. And the Court additionally concludes no cumulative error resulted.

## I. Supplemental pleading

After filing his motion to vacate his sentence, but before this Court issued any opinion on the motion, Petitioner filed a motion to amend and supplement his § 2255 pleading alleging that recent Supreme Court precedent caused an intervening change in the law, obligating the Court to vacate his conviction. *See* ECF No. 85.[8] Traditionally, such an inquiry implicates *Teague v. Lane* and the question of whether a "new rule" of federal constitutional law may be applied retroactively to petitioners seeking collateral review of their convictions. 489 U.S. 288, 310-11 (1989). However, the Court need not engage in a *Teague* analysis where, as here, it is clear that the precedent on which Petitioner relies is not at all relevant to Petitioner's claims.

### i. *Class v. United States*

First, Petitioner argues that the Supreme Court's decision in *Class v. United States*, 583 U.S. ---, 138 S. Ct. 798 (2018), made it such that this Court lacked jurisdiction over the case to render a judgment. ECF No. 85,

---

[8] Because this motion to supplement was filed before the Court issued its opinion on Petitioner's motion to vacate, the Court will not treat ECF No. 85 as a second or successive § 2255 motion requiring transfer to the Sixth Circuit pursuant to 28 U.S.C. § 1631. *See United States v. Dorsey*, No. 15-20336, 2020 WL 887907 at *1 (E.D. Mich. Feb. 24, 2020) (citing *In re Sims*, 111 F.3d 45, 47 (6th Cir. 1997)).

PageID.866-72. *Class*, however, is not applicable to Petitioner. In *Class*, the Supreme Court held that when a defendant enters a negotiated guilty plea, the guilty plea alone does not bar her from challenging the constitutionality of the statute of conviction. 138 S. Ct. at 805. Petitioner did not enter a guilty plea and therefore *Class* is inapplicable to him.

Within this argument, Petitioner also argues that there was insufficient evidence that his possession of the firearm affected interstate commerce. But at trial, the Government proffered testimony that the firearm was manufactured in Brazil, imported to Florida, and later purchased by Ms. Allen. ECF No. 61, PageID.475. This is sufficient evidence that the firearm affected interstate commerce. *See United States v. Murphy*, 107 F.3d 1199, 1211 (6th Cir. 1997) (quoting *United States v. Vincent*, 20 F.3d 229, 236 (6th Cir. 1994)) ("[P]roof that a firearm was manufactured outside the state in which the possession occurred is sufficient to support a finding that the possession was in or affected interstate commerce.").

Finally, Petitioner rehashes and reargues arguments raised in his initial § 2255 motion, such as whether the officers lacked reasonable suspicion to stop and frisk him, counsel's failure to file a motion to dismiss the indictment, and the use of Petitioner's prior felony conviction as a predicate offense for his felon gun possession conviction. For the reasons already articulated above, these claims fail.

### ii. *McCoy v. Louisiana*

Second, Petitioner argues the Supreme Court's decision in *McCoy v. Louisiana*, --- U.S. ---, 138 S. Ct. 1500 (2018) is applicable to his case and creates a reasonable probability that the outcome would have been different. ECF No. 85, PageID.873-76. As with *Class*, this is not the case. In *McCoy*, the Supreme Court held that it was impermissible for defense counsel to concede a defendant's guilt during the guilt phase of a two-phase death penalty trial over the express wishes of the defendant. 138 S. Ct. at 1508. This was based on the understanding while "[t]rial management is the lawyer's province," including decisions as to "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence," a criminal defendant is entitled to "[a]utonomy to decide that the objective of the defense is to assert innocence" and to "insist on maintaining her innocence at the guilt phase of a capital trial." *Id*.

Here, Petitioner contends that his trial counsel conceded his guilt over his express wishes. Specifically, that counsel conceded the firearm affected interstate commerce and that counsel conceded Petitioner had a prior felony conviction. Petitioner references Exhibit A, which includes excerpts of Petitioner's trial transcripts, in support. ECF No. 85, PageID.873. But a review of Exhibit A, and the trial record as a whole, does not reveal any such concession. Despite the language in Exhibit A, Petitioner did not concede the existence of the prior felony conviction at

36

trial, and the Government was forced to prove it. ECF No. 62, PageID.519-536 (direct examination of Government's opinion witness in fingerprint comparison identification, Phillip Thick). And as explained above, the Government proved that the firearm had affected interstate commerce, as it was manufactured in Brazil, imported to Florida, and purchased by Ms. Allen in Michigan.

Further, Petitioner cites no case suggesting *McCoy* may be implicated where counsel for defendant in a non-capital case concedes an element of a crime. And courts have held otherwise. *See Christensen v. United States*, No. CR-14-08164, 2020 WL 1672771, at *5 (D. Ariz. Apr. 6, 2020) (collecting cases). In sum, even assuming it would survive a *Teague* analysis, *McCoy* is inapplicable to Petitioner.

### iii. *Rosales-Mireles v. United States*

Third, Petitioner argues the Supreme Court's decision in *Rosales-Mireles v. United States*, --- U.S. ---, 138 S. Ct. 1897 (2018) is applicable to his case. He states that *Rosales-Mireles* applies because at trial, the Government failed to carry its burden of proof that the firearm Petitioner possessed affected interstate commerce. Not only is this merely a rehashing of arguments already made and addressed above, *Rosales-Mireles* does not address this issue in any way, as *Rosales-Mireles* dealt with the miscalculation of a Sentencing Guidelines range. *Id.* at 1907-08. For the reasons articulated above, this claim fails.

## IV. Conclusion

Accordingly, for the reasons stated above, the Court **GRANTS** Defendant-Petitioner's Motion to Amend and Supplement his § 2255 Pleading (ECF No. 85) and **DENIES** Defendant-Petitioner's Motion Under § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 73).

DATED: May 18, 2020.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge